Slip Op. 25-23

## UNITED STATES COURT OF INTERNATIONAL TRADE

PT ECOS JAYA INDONESIA
AND PT GRANTEC JAYA
INDONESIA,

      **Plaintiffs,**

**and**

BROOKLYN BEDDING, LLC,
FXI, INC., KOLCRAFT
ENTERPRISES INC., LEGGETT
& PLATT, INCORPORATED,
INTERNATIONAL
BROTHERHOOD OF
TEAMSTERS, AND UNITED
STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND
SERVICE WORKERS
INTERNATIONAL UNION,
AFL-CIO,

      **Consolidated Plaintiffs,**

**v.**

UNITED STATES,

      **Defendant,**

**and**

BROOKLYN BEDDING, LLC,
FXI, INC., KOLCRAFT

Before:  Jennifer Choe-Groves, Judge

Consol. Court No. 24-00001

> **ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**
>
> **Defendant-Intervenors.**

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2020–2022 administrative review of the antidumping duty order on mattresses from Indonesia.]

Dated:  March 7, 2025

Jarrod M. Goldfeder and MacKensie R. Sugama, Trade Pacific PLLC, of Washington, D.C., for Plaintiffs PT Ecos Jaya Indonesia and PT Grantec Jaya Indonesia.

Yohai Baisburd, Chase J. Dunn, and Nicole Brunda, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Consolidated Plaintiffs and Defendant-Intervenors Brooklyn Bedding, LLC, FXI, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

L. Misha Preheim, Assistant Director, and Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was David Richardson, Attorney,

Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Choe-Groves, Judge:  Plaintiffs PT Ecos Jaya Indonesia ("PT Ecos") and PT Grantec Jaya Indonesia ("PT Grantec") (collectively, "Plaintiffs" or "PT Ecos/Grantec") and Consolidated Plaintiffs and Defendant-Intervenors Brooklyn Bedding, LLC, FXI, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Consolidated Plaintiffs" or "Brooklyn Bedding") challenge the final affirmative determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on mattresses from Indonesia.  Mattresses from Indonesia, 88 Fed. Reg. 85,240 (Dec. 7, 2023) (final results of antidumping duty admin. review; 2020–2022) ("Final Results") and accompanying Issues and Decision Memorandum ("Final IDM"), PR 233.[1]

Before the Court are the Motions for Judgment on the Agency Record Pursuant to Rule 56.2 filed respectively by PT Ecos/Grantec and Brooklyn

---

[1]  Citations to the administrative record reflect the public record ("PR") and confidential record ("CR") document numbers filed in this case.  ECF Nos. 35, 36. Plaintiffs filed a corrected confidential joint appendix on December 30, 2024.  See Corrected Confidential Joint App., ECF No. 39.

Bedding.  Pls.' Mot. J. Agency R. Pursuant Rule 56.2 ("PT Ecos/Grantec's

Motion" or "PT Ecos/Grantec's Br."), ECF No. 22; Brooklyn Bedding, LLC et al's

Mot. J. Agency R. ("Brooklyn Bedding's Motion"), ECF Nos. 22, 23, Court No.

24-00002; Mem. Points Law Fact Supp. Pls.' Rule 56.2 Mot. J. Agency R.

("Brooklyn Bedding's Br."), ECF Nos. 22, 23, Court No. 24-00002.[2]

Defendant United States ("the Government" or "Defendant") filed its

comments in opposition and requested a voluntary remand on certain issues.

Def.'s Resp. Pls.' Mots. J. Agency R. ("Def.'s Br."), ECF Nos. 28, 29.  PT

Ecos/Grantec filed a response brief, agreeing with and incorporating by reference

certain arguments by the Government.  Resp. [Pls.] Mem. Points Law Fact Supp.

Consol. Pls.' Rule 56.2 Mot. J. Agency R. ("PT Ecos/Grantec's Resp."), ECF No.

30.

Brooklyn Bedding and PT Ecos/Grantec filed their reply briefs.  Mattress

Pet'rs' Reply Br. ("Brooklyn Bedding's Reply"), ECF Nos. 31, 32; Reply [PT

Ecos/Grantec] Def.'s Resp. Pls.' Mots. J. Agency R. ("PT Ecos/Grantec's Reply"),

ECF No. 33.

Oral argument was held on December 11, 2024.  Oral Arg., ECF No. 38.

For the reasons discussed below, the Court sustains in part and remands in

---

[2] Brooklyn Bedding's Motion was filed in <u>Brooklyn Bedding, LLC et al v. United States,</u> Court No. 24-00002, before it was consolidated with the instant case.

part the <u>Final Results</u>.

## ISSUES PRESENTED

This case presents the following issues:

1. Whether Commerce's determination that certain floor sofas and mattresses produced by PT Ecos/Grantec were excluded from the scope of the antidumping order is supported by substantial evidence.

2. Whether Commerce's determination to calculate ratios for constructed value profit and selling expenses and constructed export price profit based on the average of two different surrogate sources, Masterfoam Industries Sdn. Bhd. ("Masterfoam") and Kurlon Enterprise Limited ("KEL"), is supported by substantial evidence.

3. Whether Commerce's rejection of PT Ecos/Grantec's ministerial error allegation, which raised an adjustment error in Commerce's calculation of the constructed value profit and selling expense ratios for Masterfoam, is supported by substantial evidence.

## BACKGROUND

On May 14, 2021, Commerce published the antidumping duty order on mattresses from Indonesia. <u>Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Republic of Turkey, and the Socialist Republic of Vietnam</u>, 86 Fed. Reg. 26,460 (Dep't of Commerce May 14, 2021) (antidumping duty orders

and am. final affirmative antidumping determ. for Cambodia) ("Order").

On July 14, 2022, Commerce initiated the first administrative review of the antidumping duty order covering mattresses from Indonesia.   Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 42,144, 42,147 (Dep't of Commerce July 14, 2022), PR 7.  The period of review was November 3, 2020, through April 30, 2022.  Final Results, 88 Fed. Reg. 85,240.

Commerce selected PT Ecos Jaya Indonesia and PT Zinus Global Indonesia ("PT Zinus") as mandatory respondents.  Resp't Selection Mem. at 4–5, PR 17. Commerce later collapsed PT Ecos Jaya Indonesia with PT Grantec Indonesia and treated them as a single respondent, "Ecos/Grantec."   Collapsing Mem., PR 114. [3]

On June 6, 2023, Commerce published its preliminary results.  Mattresses from Indonesia, 88 Fed. Reg. 37,027 (Dep't of Commerce June 6, 2023) (prelim. results) ("Preliminary Results"), PR 189, and accompanying Preliminary Issues and Decision Memorandum ("PDM"), PR 175.   In the Preliminary Results, Commerce determined that PT Ecos/Grantec's floor sofas and tri-folding mattress toppers at issue were excluded from the scope of the Order and used the simple averages of the profit data from the financial statements of Masterfoam and KEL to

---

[3] The Court abbreviates the collapsed entity as "PT Ecos/Grantec" for the purposes of this Opinion.

calculate PT Ecos/Grantec's constructed value profit and constructed export price profit. Commerce determined that the financial statements of PT Ecos/Grantec were not usable for constructed profit calculation purposes because the entity did not have a viable home or third-country market. See PT Ecos/Grantec's Prelim. Cost Mem. at 2, PR 178. The parties submitted administrative case briefs. Brooklyn Bedding's Admin. Case Br., PR 223; PT Ecos/Grantec's Admin. Case Br., PR 227.

On December 7, 2023, Commerce published the final results of the administrative review and continued to determine that the floor sofas and tri-folding mattress toppers at issue were excluded from the scope of the Order and continued to use the simple averages of the profit data from the financial statements of Masterfoam and KEL to calculate PT Ecos/Grantec's constructed value and constructed export price profit. Final Results, 88 Fed. Reg. 85,240; Final IDM at 24–26.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination of an administrative authority as to whether a particular type of merchandise falls within the scope of an antidumping duty order. The Court will hold unlawful any determination found to

be unsupported by substantial evidence on the record or otherwise not in

accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.     Scope Exclusions of PT Ecos/Grantec's Merchandise

Brooklyn Bedding challenges Commerce's determination to exclude PT

Ecos/Grantec's floor sofas and tri-folding mattresses from the scope of the Order

as unsupported by substantial evidence.  Brooklyn Bedding's Br. at 9–25.  The

Government contends that Commerce's determination to exclude the subject

merchandise from the Order was supported by substantial evidence.  Def.'s Br. at

15–22.  PT Ecos/Grantec joins the Government's arguments.  See PT

Ecos/Grantec's Resp.

## A.     Legal Framework for Scope Determination

The descriptions of merchandise covered by the scope of an antidumping or

countervailing duty order must be written in general terms, and questions may arise

as to whether a particular product is included within the scope of an order.  See 19

C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations direct it

to issue scope rulings that clarify whether the products are in scope or out of scope.

Id.  Commerce is guided by case law and agency regulations in their scope rulings.

See Meridian Prods., LLC v. United States ("Meridian Prods."), 851 F.3d 1375,

1381 (Fed. Cir. 2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  See, e.g.,

OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope

language is unambiguous, "the plain meaning of the language governs."  Id.  If the

language is ambiguous, however, Commerce interprets the scope with the aid of

the sources set forth in 19 C.F.R. § 351.225(k)(1).  Meridian Prods., 851 F.3d at

1382.  If the (k)(1) sources do not dispositively answer the question, Commerce

may consider the (k)(2) factors under 19 C.F.R. § 351.225(k)(2).  Id.

Commerce may consider the following interpretive sources under 19 C.F.R.

§ 351.225(k)(1) to determine whether merchandise is covered by the scope of an

order:

> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;
>
> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;
>
> (C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and
>
> (D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.255(k)(1).

It is well-established that "Commerce cannot 'interpret' an antidumping order so as to change the scope of th[e] order, nor can Commerce 'interpret' an order in a manner contrary to its terms." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001). When a party challenges a scope determination, the Court must determine whether the scope of the order "contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002).

### B.    Scope Language of the Order

The scope of the Order states:

> The products covered by these orders are all types of youth and adult mattresses. The term "mattress" denotes an assembly of materials that at a minimum includes a "core," which provides the main support system of the mattress, and may consist of innersprings, foam, other resilient filling, or a combination of these materials. Mattresses may also contain: (1) "Upholstery," the material between the core and the top panel of the ticking on a single-sided mattress; or between the core and the top and bottom panel of the ticking on a double-sided mattress; and/or (2) "ticking," the outermost layer of fabric or other material (e.g., vinyl) that encloses the core and any upholstery, also known as a cover.

> The scope of these orders is restricted to only "adult mattresses" and "youth mattresses." "Adult mattresses" are frequently described as "twin," "extra-long twin," "full," "queen," "king," or "California king" mattresses. "Youth mattresses" are typically described as "crib," "toddler," or "youth" mattresses. All adult and youth mattresses are included regardless of size and size description.

The scope encompasses all types of "innerspring mattresses," "non-innerspring mattresses," and "hybrid mattresses." "Innerspring mattresses" contain innersprings, a series of metal springs joined together in sizes that correspond to the dimensions of mattresses. Mattresses that contain innersprings are referred to as "innerspring mattresses" or "hybrid mattresses." "Hybrid mattresses" contain two or more support systems as the core, such as layers of both memory foam and innerspring units.

"Non-innerspring mattresses" are those that do not contain any innerspring units. They are generally produced from foams (e.g., polyurethane, memory (viscoelastic), latex foam, gel-infused viscoelastic (gel foam), thermobonded polyester, polyethylene) or other resilient filling.

Mattresses covered by the scope of these orders may be imported independently, as part of furniture or furniture mechanisms (e.g., convertible sofa bed mattresses, sofa bed mattresses imported with sofa bed mechanisms, corner group mattresses, day-bed mattresses, roll-away bed mattresses, high risers, trundle bed mattresses, crib mattresses), or as part of a set in combination with a "mattress foundation." "Mattress foundations" are any base or support for a mattress. Mattress foundations are commonly referred to as "foundations," "boxsprings," "platforms," and/or "bases." Bases can be static, foldable, or adjustable. Only the mattress is covered by the scope if imported as part of furniture, with furniture mechanisms, or as part of a set in combination with a mattress foundation. . . .

* * *

Also excluded is certain *multifunctional furniture* that is convertible from seating to sleeping, regardless of filler material or components, where that filler material or components are upholstered, integrated into the design and construction of, and inseparable from, the furniture framing, and the outermost layer of the multifunctional furniture converts into the sleeping surface. Such furniture may, and without limitation, be commonly referred to as "convertible sofas," "sofabeds," "sofa chaise sleepers," "futons," "ottoman sleepers" or a like description. . . .

* * *

Additionally, also excluded from the scope of these orders are **"mattress toppers."** A "mattress topper" is a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress. Excluded mattress toppers have a height of four inches or less.

The products subject to these orders are currently properly classifiable under HTSUS subheadings: 9404.21.0010, 9404.21.0013, 9404.29.1005, 9404.29.1013, 9404.29.9085, and 9404.29.9087. Products subject to these orders may also enter under HTSUS subheadings: 9404.21.0095, 9404.29.1095, 9404.29.9095, 9401.40.0000, and 9401.90.5081. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise subject to these orders is dispositive.

Order, 86 Fed. Reg. 26,460 (emphasis added).

## C.    "Multifunctional Furniture" Exclusion

Brooklyn Bedding argues that Commerce should not have excluded PT Ecos/Grantec's multifunctional floor sofas from the Order under the exclusion for "multifunctional furniture." See Brooklyn Bedding's Br. at 22–25. The subject merchandise includes two variations of floor sofas, described as "8 Inch Gel Foam Mattress and Floor Sofa," that Commerce determined were excluded from the Order. See Final IDM at 24; Resp. Pet'rs' Sec. C Rebuttal Factual Information at Att., PR 99, CR 134.

### 1.    Plain Language

The "multifunctional furniture" scope language excludes from the Order

"certain multifunctional furniture that is convertible from seating to sleeping,

regardless of filler material or components, where that filler material or

components are upholstered, integrated into the design and construction of, and

inseparable from, the furniture framing, and the outermost layer of the

multifunctional furniture converts into the sleeping surface." Order, 86 Fed. Reg.

26,460.  The Order specifies that multifunctional furniture subject to the exclusion

may be commonly referred to as "convertible sofas," "sofabeds," "sofa chaise

sleepers," "futons," "ottoman sleepers" or a similar description.  Id.  In this case,

the subject merchandise are referred to as "foam mattresses and floor sofas."  Final

IDM at 24.

Whether an ambiguity exists in an antidumping order is a question of law

that the Court considers de novo.  Meridian Prods., 851 F.3d at 1382.  The Court

considered each aspect of the "multifunctional furniture" exclusion, as discussed

below, and concludes that the "multifunctional furniture" exclusion is

unambiguous.

The first clause of the "multifunctional furniture" exclusion requires that an

excluded floor sofa must be "convertible from seating to sleeping, regardless of

filler material or components." Order, 86 Fed. Reg. at 26,463.  The meaning of

this clause is unambiguous.  For a floor sofa to meet this exclusion, the floor sofa must be able to be converted from a sitting configuration to a sleeping configuration.  A floor sofa may meet this exclusion regardless of the type of material that is used for the filling of the floor sofa.

The second clause of the "multifunctional furniture" exclusion requires that "filler material or components are upholstered, integrated into the design and construction of, and inseparable from, the furniture framing."  Id.

The Order defines "upholstery" as "the material between the core and the top panel of the ticking on a single-sided mattress; or between the core and the top and bottom panel of the ticking on a double-sided mattress" and also defines "ticking" as "the outermost layer of fabric or other material (e.g., vinyl) that encloses the core and any upholstery, also known as a cover."  Id.  To "upholster" means "to furnish with or as if with upholstery."  Upholster, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/upholster (last visited Mar. 7, 2025).

The scope exclusion language requires that the filler material or components of a floor sofa are "integrated into the design and construction of, and inseparable from, the furniture framing."  Order, 86 Fed. Reg. at 26,463.  "Integrated" means "to [be] incorporate[d] into a larger unit" or "to [be] unite[d] with something else."  Integrate, Merriam-Webster Dictionary, available at https://www.merriam-

webster.com/dictionary/integrate (last visited Mar. 7, 2025).  "Inseparable" means
"incapable of being separated or disjoined" from the other entity.

Inseparable, Merriam-Webster Dictionary, available at https://www.merriam-
webster.com/dictionary/inseparable (last visited Mar. 7, 2025).  "Inseparable" also
means "said of two or more united things or persons, or of their connection or
relation."  Inseparable, Oxford English Dictionary, available at
https://www.oed.com/dictionary/inseparable_adj?tab=meaning_and_use (last
visited Mar. 7, 2025).  A "frame" is defined as "the underlying constructional
system or structure that gives shape or strength."  Frame, Merriam-Webster
Dictionary, available at https://www.merriam-webster.com/dictionary/frame (last
visited Mar. 7, 2025).

The Court concludes that the meaning of the second clause of the scope
exclusion is unambiguous.  Based on the definitions of "integrated," "inseparable,"
and "furniture framing," the Court concludes that the second clause of the
"multifunctional furniture" exclusion means that a floor sofa's filler or components
must be incorporated into or connected to the "furniture framing," which is the
underlying constructional system or structure that gives shape or strength to a sofa.

The third clause of the "multifunctional furniture" exclusion states that "the
outermost layer of the multifunctional furniture converts into the sleeping surface."
Order, 86 Fed. Reg. at 26,463.  It is clear that the product's outermost layer must

be able to be used for sleeping after it is converted from a seat to a sleeping surface.

In summary, the Court concludes that the "multifunctional furniture" exclusion language is unambiguous. The relevant scope terms are unambiguous when they have a "single clearly defined or stated meaning." Vandewater Int'l Inc. v. United States, No. 2023-1093, 2025 WL 719966, at *6 (Fed. Cir. Mar. 6, 2025) (citing Meridian Prods., 851 F.3d at 1382 n.7). Commerce did not determine clearly that the scope language for the "multifunctional furniture" exclusion was unambiguous, but Commerce did not rely on (k)(1) sources to interpret the scope language and only examined documents to determine if the evidence supported its determination that the floor sofas were excluded under the scope language.

## 2. Substantial Evidence

The Parties focus their arguments solely on the second clause of the "multifunctional furniture" exclusion. As discussed above, the Court concludes that the second clause of the "multifunctional furniture" exclusion means that a floor sofa's filler or components must be incorporated into or connected to the "furniture framing," which is the underlying constructional system or structure that gives shape or strength to a sofa.

Commerce examined PT Ecos/Grantec's product brochure to support its determination that PT Ecos/Grantec's foam mattress floor sofas met all of the

criteria for the "multifunctional furniture" exclusion.  See Final IDM at 20–26; PT

Ecos/Grantec's Sec. A QR at Ex. A-18 ("PT Ecos/Grantec's Product Brochure"),

PR 40.

      Brooklyn Bedding contends that Commerce's determination to exclude PT

Ecos/Grantec's floor sofas was not supported by substantial evidence because the

products do not have any "furniture framing."  Brooklyn Bedding's Br. at 23–24.

Brooklyn Bedding suggests that the scope language "furniture framing" requires

that a floor sofa's frame must be made of non-foam materials, such as PT

Ecos/Grantec's "futon couch bed" or "multi-functional sofabed," which have foam

cushions and "a solid wood frame and high-quality metal legs" that constitute the

furniture framing to which the foam cushions are attached.  Id. at 23–25.

Defendant contends that Commerce's determination was supported by substantial

evidence because the mattress itself can serve as both a mattress and frame and the

exclusion does not require the frame to be made of a particular material.  Def.'s Br.

at 15–17.  The Court observes that the plain language of the "multifunctional

furniture" exclusion does not require that the furniture framing be made of any

particular material, such as wood or metal.  While many sofabed frames are made

of wood, metal, or other rigid materials, the exclusion language in the Order does

not require that the furniture frame must consist of any particular material.  Thus,

because the plain language of the "multifunctional furniture" exclusion does not

specify the frame's materials, the Court agrees with Commerce's determination

that PT Ecos/Grantec's floor sofas are not required to have frames made of wood,

metal, or a similar rigid material, and may meet the exclusion requirements if PT

Ecos/Grantec's floor sofas are made of foam materials that otherwise meet the

exclusion requirements by providing an underlying constructional system or

structure that gives shape or strength to a sofa.

        The Court next considers the requirement in the exclusion language that a

floor sofa's filler or components must be "integrated into" and "inseparable from"

the furniture framing.  See Order.  Commerce cited PT Ecos/Grantec's product

brochure as evidence, stating that, "the product described as '8 inch Gel Foam

Mattress and Floor Sofa' is one integrated unit consisting of foam and a cover.

The unit serves as both mattress and frame; there are no pieces of these products

that separate from one another."  See Final IDM at 24–25 (citing PT

Ecos/Grantec's Product Brochure).  The product brochure described the "8 Inch

Gel Foam Mattress" as a "multi-functional mattress" that is "perfect for

unexpected guests, sleepover, apartment dwellers, or leisure activities such as

having a cup of tea/coffee, reading a book, watching TV or gaming.  With Gel

infused foam and supportive high density foam providing soothing leisure or

sleeping."  See PT Ecos/Grantec's Product Brochure.

Record evidence supports Commerce's determination that Plaintiffs' floor sofas met the requirements of the second clause in the exclusion provision. Plaintiffs' product brochure showed that the floor mattress was convertible from seating to sleeping, the foam mattress components were integrated into and inseparable from the furniture framing, and the floor sofa provided an underlying constructional system or structure that gave shape and strength to the sofa. See id. The product brochure cited by Commerce showed that when folded into a sofa, the floor sofa provided structure by allowing a user to fold the mattress into two sizes, one version that had a smaller surface area for sitting and a second version that had a larger surface area for sitting. Id. The evidence cited by Commerce demonstrated that both sizes of Plaintiffs' floor sofa had an underlying constructional system or structure that gave shape and strength to the sofa frame, with a seat, a back, and arm rests. Id.

Because Commerce cited substantial record evidence in the form of Plaintiffs' product brochure showing that Plaintiffs' floor sofas contained filler or components that were incorporated into and connected to the furniture frame, which was an underlying constructional system or structure that gave shape and strength to the sofa, the Court concludes that Commerce's determination to exclude PT Ecos/Grantec's foam mattress floor sofas from the Order under the "multifunctional furniture" exclusion was supported by substantial evidence.

### D.    Mattress Topper Exclusion

Brooklyn Bedding argues that Commerce should not have determined that PT Ecos/Grantec's tri-folding mattresses were excluded under the "mattress topper" exclusion of the <u>Order</u>.  <u>See</u> Final IDM at 25–26.

### 1.    Plain Language

The "mattress topper" scope language excludes from the <u>Order</u> "a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress."  <u>Order</u>, 86 Fed. Reg. at 26,463.  Excluded mattress toppers have a height of four inches or less.  <u>Id.</u>  The Court considered each aspect of the "mattress topper" exclusion, as discussed below, and concludes that the "mattress topper" exclusion is unambiguous.

First, the meaning of the height requirement of the product being "four inches or less" is clear.  Second, the requirement for an excluded mattress to be "a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress" is also clear.  To "supplement" is defined as "add[ing] something to something to make it larger or better." <u>Supplement</u>, Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/supplement (last visited Mar. 7, 2025).  To supplement a mattress, an excluded product must add another layer when placed on top of an existing mattress.

Commerce did not state that the scope language for the "multifunctional furniture" exclusion was unambiguous, but Commerce did not rely on (k)(1) sources to interpret the scope language and only examined documents to determine if the evidence supported its determination that Plaintiffs' tri-folding mattress products were excluded under the scope language.

## 2.    **Substantial Evidence**

Brooklyn Bedding asserts that Commerce's determination to exclude PT Ecos/Grantec's tri-folding mattresses under the "mattress toppers" exclusion provision was not supported by substantial evidence because the product brochure evidence demonstrates that Plaintiffs' products were marketed as traditional mattresses, rather than as a "supplement" to an existing mattress.[4]  See Brooklyn Bedding's Br. at 12–21; see also Final IDM at 25 ("[PT Ecos/Grantec's] tri-folding mattresses, or toppers, all have a height of four inches or less, a fact which [is] not disputed by [Brooklyn Bedding].").  Brooklyn Bedding also argues that

---

[4]  Commerce excluded eleven products under the "mattress topper" exclusion.  Of these eleven excluded products, Brooklyn Bedding contested the exclusion of only ten types of tri-folding mattresses.  Brooklyn Bedding's Br. at 20 ("In contrast, all ten of Ecos/Grantec's tri-folding mattresses are produced to sizes that do not correspond to traditional mattress sizes"); see Resp. Pet'rs' Sec. C Rebuttal Factual Information at Att. (showing eleven excluded products under the mattress topper exclusion).  Of the eleven challenged products, Brooklyn Bedding did not challenge the exclusion of the "4 in Memory Foam Topper" with the product code 04TP02, which is included in the product brochure.

inconsistent labelling in the product brochure and specification sheets demonstrate that the excluded products were not "mattress toppers." See Brooklyn Bedding's Br. at 12–21.

The Government argues that Commerce's exclusion of the tri-folding mattresses was supported by substantial evidence because Plaintiffs' products have a height of four inches or less and their dual use as mattresses and toppers does not disqualify the products from the "mattress topper" exclusion. Def.'s Br. at 17–22.

Commerce examined PT Ecos/Grantec's product brochure and product specification sheets to support its determination that PT Ecos/Grantec's tri-folding mattresses met the "mattress topper" exclusion. See Final IDM at 25–26; PT Ecos/Grantec's Product Brochure; see PT Ecos/Grantec's Suppl. QR at Ex. SC-3 ("PT Ecos/Grantec's Product Specification Sheets"), PR 123–26. Based on its review of record evidence, Commerce determined that Plaintiffs' products met the requirements in the "mattress topper" exclusion because: (1) the products had a height of four inches or less; (2) the product codes were described as "toppers" in the product brochure and specification sheets; and (3) the products were "removable and portable" and could be used as both a mattress and topper. See Final IDM at 25–26 (citing PT Ecos/Grantec's Product Brochure; PT Ecos/Grantec's Product Specification Sheets).

The Court finds unpersuasive Brooklyn Bedding's argument that PT Ecos/Grantec's tri-folding mattresses could not function as mattress supplements because the products were not designed or produced in sizes that corresponded to traditional mattress sizes.  See Brooklyn Bedding's Br. at 19–21.  Brooklyn Bedding points to PT Ecos/Grantec's sale of other mattress toppers, such as its "Gel Memory Foam Air Flow Topper" and different types of "2.5 Inch Gel Foam Topper," which were described as products that supplemented existing mattresses in traditional sizes of twin, full, queen, and king, while the tri-folding mattresses at issue in this case did not correspond to traditional mattress sizes.  Id.

The Court notes that the plain language of the scope exclusion does not require that excluded mattress toppers must be in specific sizes, such as twin, full, queen, and king mattress sizes.  Order, 86 Fed. Reg. 26,460.  The scope exclusion language only requires that the products must be less than four inches high and must be "a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress."  Id. at 26,463.

The Court also finds unpersuasive Brooklyn Bedding's argument that Plaintiffs' products should not have been excluded because the products have dual uses as mattresses and mattress toppers.  See Brooklyn Bedding's Reply at 5–6. The Court notes that the scope exclusion language does not require that excluded mattress toppers must have only a single use, and the scope exclusion language

does not preclude mattresses from having dual purposes.  <u>Order</u>, 86 Fed. Reg.

26,460.

### a.    Commerce's Determinations of Excluded Products Supported By Substantial Evidence

As discussed below in more detail, Commerce cited sufficient record

evidence to support its "mattress topper" exclusion determination for only five of

the ten products at issue in this case.  Commerce's determination to exclude five of

PT Ecos/Grantec's products was not supported by substantial evidence.

With respect to the first grouping of five products for the "mattress topper"

exclusion, Commerce cited record evidence showing that Plaintiffs' tri-folding

mattresses were less than four inches high, were removable, and supplemented

mattresses by providing an additional layer on top of the mattresses for Product

Codes 04TM01S, 04TM02S, 04TM02T, 04TM03S, and 04TM04S.  <u>See</u> Final

IDM at 25 (citing PT Ecos/Grantec's Product Brochure; PT Ecos/Grantec's

Product Specification Sheets).

Commerce cited Plaintiffs' product brochure, which showed that PT

Ecos/Grantec's "4 inch Tri-Folding Memory Foam Mattress" (Product Codes

04TM01S, 04TM02S, and 04TM02T) was described as a "Tri-fold topper" and

was "the ideal option for visitors, sleepovers, car trips, camping or dorm room bed.

Portable and comfortable mattress, no pain in the back or neck when people sleep

on it.  Complete with supportive memory foam mattress providing soothing

sleeping."  PT Ecos/Grantec's Product Brochure; Final IDM at 25.  Similarly, PT

Ecos/Grantec's "4 inch Tri-Folding Topper" (Product codes 04TM03S and

04TM04S) were described in Plaintiffs' product brochure in the same way as PT

Ecos/Grantec's "4 inch Tri-Folding Memory Foam Mattress" (Product Codes

04TM01S, 04TM02S, and 04TM02T), except the outer cover was described as a

"washable tricot cover" rather than "a washable nice jacquard cover."  PT

Ecos/Grantec's Product Brochure; see Final IDM at 25.  This evidence supports

Commerce's determination that these tri-fold toppers should be excluded from the

Order under the "mattress topper" exclusion because the evidence described the

products as a "Tri-fold topper" and indicated that the products could be used on a

dorm room bed, presumably as a supplement on top of an existing mattress.  While

the evidence regarding the specific uses of the products could be clearer,

Commerce's reliance on this evidence was reasonable.

        Three of the product codes in the product brochure were labeled as a "4 inch

Tri-Folding Foam Folding Mattress" (Product Codes 04TM01S, 04TM02S,

04TM02T) and were labeled as "toppers" in the specification sheets.  See PT

Ecos/Grantec's Product Brochure; PT Ecos/Grantec's Product Specification

Sheets.  The Court acknowledges and agrees with Brooklyn Bedding's argument

that merely naming a product as a "topper" does not automatically qualify such

product for the "mattress topper" exclusion.  Here, a review of the product

brochure cited by Commerce shows that these three products could be used on

dorm room beds, suggesting that the "toppers" could be used as a supplement on

top of existing dorm room bed mattresses, which factually satisfies the criteria of

the "mattress topper" exclusion.  Therefore, the evidence cited by Commerce

supports its determination that these products meet the "mattress topper" exclusion.

Brooklyn Bedding also argues that Commerce's determination to exclude

the tri-folding mattresses was not supported by substantial evidence because

Commerce previously determined that tri-folding mattresses were within the scope

of the Order in a prior scope ruling.  See Brooklyn Bedding's Br. at 9–12; see also

Mattress Pet'rs' Rebuttal Factual Information Submitted Resp. PT Ecos/Grantec's

Sec. C QR at Ex. 1 ("Mattresses from Cambodia, Indonesia, Malaysia, Serbia,

Thailand, the People's Republic of China, the Republic of Turkey, and the

Socialist Republic of Vietnam: Final Scope Decision Memorandum" or "Prior

Scope Ruling"), PR 71.  In the Prior Scope Ruling, Commerce determined that

Night & Day's tri-fold memory foam mattresses were in scope because the

products did not meet the requirements for the "multifunctional furniture" or futon

exclusions.  Prior Scope Ruling at 13–15.  The subject merchandise were tri-

folding mattresses, comprised of three equally-sized rectangular foam components,

no more than 6.25 inches thick.  Id. at 14.  The Prior Scope Ruling is inapposite

because it did not address the "mattress topper" exclusion, and thus Commerce did

not need to address or rely on the Prior Scope Ruling in this case.

> **b.    Commerce's Determinations of Excluded Products Not Supported By Substantial Evidence**

In contrast to the first five products discussed above, Commerce did not cite

sufficient record evidence to support its determination regarding the "mattress

topper" exclusion for the remaining five products, identified by Product Codes

04TM02X, 04TMB1S, 04TMF01S, 04TM02O, and 04TM02F.

Commerce cited a product brochure in support of its determination, in which

PT Ecos/Grantec's "4 inch Tri-Folding Memory Foam Mattress and Sofa Bed"

(Product Code 04TM02X) was described as "the ideal option for visitors,

apartment dwellers, college dorms, also great for car trips, video gaming, reading

book[s], watching TV or camping.  With supportive high density foam providing

soothing leisure or sleeping."  PT Ecos/Grantec's Product Brochure; Final IDM at

25.  This evidence does not demonstrate factually that Product Code 04TM02X

could be used on top of a mattress as a supplement because the brochure only

describes Plaintiffs' foam mattress and sofa bed as a sleep mattress, with a

removable cover and zipper system.  PT Ecos/Grantec's Product Brochure.  The

brochure does not indicate that Product Code 04TM02X could be used on top of a

dorm room bed.  It is a subtle distinction, but here Product Code 04TM02X is

described for use "in college dorms," while the first set of products discussed

above were described for use as "an option for . . . dorm room bed." Id.  The

evidence shows that the first set of products could be used on a dorm room bed,

presumably as a supplement on top of a mattress, while Product Code 04TM02X

could be used "in college dorms," perhaps on the floor, but not specifically on top

of a bed. Id.  Without a clear indication from the evidence that Product Code

04TM02X could be used on top of a mattress as a supplement, the Court concludes

that the evidence does not support Commerce's determination that Product Code

04TM02X met the "mattress topper" exclusion requirements.

Product Codes 04TMB1S, 04TMF01S, 04TM02O, and 04TM02F were not

included in the product brochure cited by Commerce.  These four products were

only mentioned in product specification sheets that contained minimal information,

with each product being referred to as a "topper."  PT Ecos/Grantec's Product

Specification Sheets.  These product specification sheets contain no factual

information demonstrating how the products were intended to be used, and did not

state that these products could be used on top of a bed as a mattress supplement, or

how they would otherwise meet the "mattress topper" exclusion requirements. Id.

Merely having the product name "topper," without any record evidence showing

how the products were intended to be used as a mattress supplement, does not

support Commerce's determination that Product Codes 04TMB1S, 04TMF01S, 04TM02O, and 04TM02F met the "mattress topper" exclusion.

In summary, the Court concludes that Commerce's determination that PT Ecos/Grantec's tri-folding mattresses for Product Codes 04TM01S, 04TM02S, 04TM02T, 04TM03S, and 04TM04S were excluded from the <u>Order</u> under the "mattress topper" exclusion was supported by substantial evidence. However, the Court concludes that Commerce's determination that PT Ecos/Grantec's Product Codes 04TM02X, 04TMB1S, 04TMF01S, 04TM02O, and 04TM02F were excluded from the <u>Order</u> under the "mattress topper" exclusion was not supported by substantial evidence.

## II. Commerce's Calculation of Constructed Value Profit, Selling Expenses, and Constructed Export Price Ratios

PT Ecos/Grantec contends that Commerce's use of selected surrogate financial statements was not appropriate because KEL has a different customer base and the "other income" reflected in the Masterfoam financial statements should have been excluded from the calculations of cost of goods sold of the constructed export price profit and constructed value selling expense rate. PT Ecos/Grantec's Br. at 8–17.

The Government seeks a voluntary remand to address PT Ecos/Grantec's challenges regarding Commerce's calculation of constructed value profit, selling

expenses, and constructed export price ratios using the financial statements of

Masterfoam and KEL, as well as Commerce's rejection of a ministerial error

allegation.  Def.'s Br. at 22–24.

PT Ecos/Grantec agrees with and supports Defendant's request for remand.

PT Ecos/Grantec's Reply at 1.  Brooklyn Bedding does not oppose the

Government's request for remand.  See Brooklyn Bedding's Resp.; Brooklyn

Bedding's Reply.

### A.    Legal Standard

A reviewing court has discretion over whether to grant a voluntary remand,

and a remand is generally appropriate "if the agency's concern is substantial and

legitimate," but may be refused "if the agency's request is frivolous or in bad

faith."  See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).

Vague and unsupported requests for remand are insufficient.  Corus Staal BV v.

U.S. Dep't of Commerce, 27 CIT 388, 391–95, 259 F.Supp.2d 1253, 1257–60

(2003); see also Corus Staal BV v. United States, 29 CIT 777, 781–83, 387

F.Supp.2d 1291, 1296–97 (2005) ("The Government must give due regard to

finality and cannot simply ask for a do-over any time it wishes.").

### B. Commerce's Use of Masterfoam's and KEL's Financial Statements and Alleged Rejection of Ministerial Error

Commerce determined that Masterfoam's and KEL's financial statements constituted the best source of constructed value and selling expense data on the record in this proceeding. Final IDM at 11. Commerce calculated the constructed value profit rate and selling expense rate for each of the two companies, then calculated the simple average of the two constructed value profit and selling expense rates to derive PT Ecos/Grantec's and PT Zinus' constructed value profit and selling expenses. Id. Commerce reasoned that because PT Ecos/Grantec and PT Zinus Indonesia did not have home market or third-country sales, and there were no other respondents investigated in the proceeding, the only methodology available to calculate the constructed value profit was "any other reasonable method" under Section 773(e)(2)(B)(iii) of the Act. Id. at 12. Commerce disagreed that KEL's business operations and profit experience did not resemble those of PT Ecos/Grantec, stating that KEL engaged in the production and sales of identical merchandise, KEL's sales and marketing activities were not unusual activities for a company engaged in the manufacturing and sales of mattresses and bedding products, and KEL's data met all of the relevant criteria. Id. at 13–14.

PT Ecos/Grantec filed a timely ministerial error allegation identifying Commerce's failure to exclude Masterfoam's "other income" from the cost of

goods sold denominator as a clerical error, which Commerce disagreed with,

stating that it was not a clerical error, but a methodological issue and declined to

make the requested adjustment.   See Final IDM at 15; PT Ecos/Grantec's

Ministerial Error Allegation, PR 242–43; Commerce's Ministerial Error Mem., PR

246.  Commerce disagreed with PT Ecos/Grantec's argument that Commerce

should include certain investment expense line items, such as "exceptional item

expense" and "other income, gains on fair valuation of current investments" in

KEL's financial statement for calculating the constructed value and constructed

export price profit ratio because they were administrative expenses.  Final IDM at

15.

The Government requests remand for Commerce to: (1) reconsider its

determination to include "other income" from the surrogate financial statements of

Masterfoam in the cost of goods sold denominator of the constructed value profit

and selling expense calculation; and (2) include the financial statements of KEL in

the constructed value, selling expenses, and constructed export price profit

calculations.  See Def.'s Br. at 22–24.  Because Commerce seeks to address the

challenges brought by PT Ecos/Grantec and correct issues of "substantial and

legitimate concern" in Commerce's reconsideration of the Final Results, the Court

concludes that remand is appropriate.

**CONCLUSION**

For the foregoing reasons, the Court sustains in part and remands in part the

Final Results. The Court sustains Commerce's determination that PT

Ecos/Grantec's floor sofas and five of PT Ecos/Grantec's tri-folding mattresses

(Product Codes 04TM01S, 04TM02S, 04TM02T, 04TM03S, and 04TM04S) were

excluded from the scope of the Order. The Court concludes that Commerce's

determination that five of PT Ecos/Grantec's tri-folding mattresses (Product Codes

04TM02X, 04TMB1S, 04TMF01S, 04TM02O, and 04TM02F) were excluded

from the scope of the Order is unsupported by substantial evidence. The Court

remands the issues of Commerce's use of the financial statements of Masterfoam

and KEL in calculating constructed value and constructed export price profit and

Commerce's rejection of PT Ecos/Grantec's allegation of ministerial error.

Accordingly, it is hereby

**ORDERED** that the Government's request for remand is granted; and it is

further

**ORDERED** that PT Ecos/Grantec's Motion, ECF No. 22, is granted in part

and denied in part; and it is further

**ORDERED** that Brooklyn Bedding's Motion, ECF No. 22, Court No. 24-

00002, is granted in part and denied in part; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1)    Commerce shall file its remand determination on or before May 7,

        2025;

(2)    Commerce shall file the administrative record on or before May 21,

        2025;

(3)    Comments in opposition to the remand determination shall be filed on

        or before June 6, 2025;

(4)    Comments in support of the remand determination shall be filed on or

        before July 7, 2025; and

(5)    The joint appendix shall be filed on or before July 10, 2025.


                                                    /s/ Jennifer Choe-Groves
                                            Jennifer Choe-Groves, Judge


Dated:     March 7, 2025
              New York, New York